UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-CR-577-9 | |
| | . | CASE NO. 4:22-MJ-2398-04 | |
| PLAINTIFF, | . | | |
| | . | | |
| V. | . | HOUSTON, TEXAS | |
| | . | THURSDAY, OCTOBER 27, 2022 | |
| JYMONTE MCCLENDON | . | 09:56 A.M. TO 11:04 A.M. | |
| | . | | |
| DEFENDANT. | . | | |

. . . . . . . . . . . . . . . .

PRELIMINARY EXAMINATION/DETENTION HEARING

BEFORE THE HONORABLE ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: MAYRA M. MARQUEZ

CASE MANAGER:                   SHANNON JONES

OFFICIAL INTERPETER:            NONE PRESENT

TRANSCRIPTION SERVICE BY:

TRINITY TRANSCRIPTION SERVICES
1081 Main Street
Surgoinsville, TN 37873
281-782-0802
battshott@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-CR-577-9 |
| | . | CASE NO. 4:22-MJ-2398-04 |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | THURSDAY, OCTOBER 27, 2022 |
| JYMONTE MCCLENDON | . | 09:56 A.M. TO 11:04 A.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-MJ-2398-01 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | |
| JCOI BARLEY, | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-MJ-2398-07 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | |
| TERRY ARDOIN, | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | CASE NO. 4:22-MJ-2398-03 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | |
| TERRELL DAVIS, | . | |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .

PRELIMINARY EXAMINATION/DETENTION HEARING

BEFORE THE HONORABLE ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE


Appearances:

**For the GOVERNMENT:**            **LISA MARIE COLLINS, ESQ.**
                                   Assistant United States Attorney
                                   Office of the United States
                                     Attorney
                                   1000 Louisiana, Suite 2300
                                   HOUSTON, TX 77002

**For DEFENDANT MCCLENDON:**       **KENNETH MCGUIRE, ESQ.**
                                   Assistant Federal Public Defender
                                   U.S. Public Defender's Office
                                   440 Louisiana Street, Suite 1350
                                   Houston, TX 77002

**For DEFENDANT BARLEY:**          **WINSTON E. COCHRAN, JR., ESQ.**
                                   P.O. Box 2945
                                   League City, TX 77574

**For DEFENDANT TERRY ARDOIN:**    **GREGORY C. GLADDEN, ESQ.**
                                   Attorney at Law
                                   3017 Houston Avenue
                                   Houston, TX 77009

**For DEFENDANT DAVIS:**           **JOYCE A. RAYNOR, ESQ.**
                                   J Raynor Carr & Associates
                                   9894 Bisonnett, Suite 243
                                   Houston, TX 77036

**U.S. PROBATION:**                **SERGIO SALINAS**

**UNITED STATES MARSHAL:**         **MARTIN WHITE**

Transcription Service:             Cheryl L. Battaglia
                                   Trinity Transcription Services
                                   1081 Main Street
                                   Surgoinsville, TN 37873

## WITNESSES

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Ms. Collins | 7 | | 27/41 | |
| By Mr. Cochran | | 12 | | 33 |
| By Mr. McGuire | | 15 | | 33 |
| By Ms. Raynor | | 22 | | 30 |
| By Mr. Gladden | | | | 30 |

## Exhibits

| Government | | Offered | Admitted |
|---|---|---|---|
| G-1 | Proffer | | 3 |
| G-2 | Terry Ardoin Pretrial Report | | 4 |
| G-3 | Jcoi Barley Pretrial Report | | 4 |
| G-4 | Terrell Davis Pretrial Report | | 4 |
| G-5 | Jymonte McClendon Pretrial Report | | 4 |

1      **Houston, Texas; Thursday, October 27, 2022; 09:56 a.m.**

2        **(All parties appearing via videoconference)**

3            **UNITED STATES MARSHAL:**  All rise.

4        **(Pause in the proceeding.)**

5            **THE COURT:**  Okay.  Good morning.  Please be seated.

6        **(Pause in the proceeding.)**

7            **THE COURT:**  Okay.  We are here.  I'll call out the

8    names just to make sure.

9            It's *22-MJ-2398*.  It's a Probable Cause and Detention

10   Hearing.  Jcoi Barley, where are you, sir?  And you're here

11   with your attorney, Winston Cochran.  Good morning.

12           **DEFENDANT BARLEY:** Good morning.

13           **THE COURT:**  Jamonte McClendon?

14          **MR. MCGUIRE:**  Good morning, your Honor.  Ken

15   McGuire --

16           **THE COURT:**  Thank you.

17          **MR. MCGUIRE:**  -- for Mr. McLendon.

18           **THE COURT:**  And Terry Ardoin'a here.  I see

19   Mr. Gladden in the back.  Okay.  Good morning, sir.

20           And then when -- when Marc Carter shows up, I'm going

21   to let him.  He's just going to make his argument and we'll

22   interrupt what we're doing.

23           So, gentlemen, we went through this yesterday.  How

24   we're going to proceed is I assume the Government's given

25   each -- each attorney the proffer?

1     **MS. COLLINS:**  Yes, your Honor.

2     **THE COURT:**  Okay.

3     **MR. MCGUIRE:**  We appreciate it.

4     **(Voices whispering.)**

5     **THE COURT:**  The Government's going to put Detective

6  Bock on.  He'll swear to the proffer like he did yesterday.

7  And then I'll turn it over to you all for cross examination.

8         Yesterday the attorneys were real -- oh, I -- I

9  forgot one.  I'm so sorry, ma'am.  Terrell Davis?

10    **MS. RAYNOR:**  Yes, your Honor.

11    **THE COURT:**  And Joyce Raynor's here for -- sorry

12 about that, ma'am.

13        Yesterday the attorneys were really good to

14 understand that this is a Probable Cause Hearing and a

15 Detention Hearing.  It's not a full-on discovery hearing.  It's

16 not a trial.  And that is -- I'm sure you explained to your

17 clients that it's a lot lower standard of proof.  Today it's

18 just a probable cause.

19        It's -- basically is it more reasonable than not that

20 a crime has been committed.  The Government's allowed to get

21 into a whole bunch of evidence and hearsay.  There's really no

22 rules of evidence that apply today that would apply at a trial.

23        At a trial, the rules of evidence apply strictly.

24 And it's also beyond a reasonable doubt.  So just -- because

25 there's probable cause really doesn't mean anything other than

1    the case moves on.  But -- so it's a lot less relaxed than the

2    standard.

3              So with that, let me turn it over to Miss Collins.

4              **MR. COCHRAN:**  Yes, your Honor.

5              United States would call Detective Adam Bock to the

6    stand.

7              **THE COURT:**  Okay.

8         **(Pause in the proceeding.)**

9              **THE COURT:**  So before we do that, let me just -- you

10   can sit down, Detective Bock.

11        **(Pause in the proceeding.)**

12             **THE COURT:**  Just for the record, what we did

13   yesterday is we marked his proffer as Exhibit 1.  Is there any

14   objection -- we marked and entered for the limited purpose of

15   this hearing.  Is there any objection to admitting his proffer

16   as exhibit -- Government's Exhibit 1?

17             **MS. RAYNOR:**  No objection.

18             **MR. MCGUIRE:**  No objection.

19             **MR. COCHRAN:**  No objection.

20             **MR. GLADDEN:**  No objection, your Honor.

21             **THE COURT:**  Okay.

22        **(Government's Exhibit Number 1 was received into**

23   **evidence.)**

24             **THE COURT:**  And then what I'd like to do, and again,

25   it's just for the limited purpose of this hearing, is admit

1    Travonte Ardoin's Pretrial Report as Government's Exhibit 2,

2    Jcoi Barley's Pretrial Report as Government's Exhibit 3,

3    Terrell Davis' Pretrial Report as Government's Exhibit 4, and

4    Jymonte McClendon's Pretrial Report as Government's Exhibit 5.

5              Any the -- oh, sorry.  It's not Trevonte.  It's Terry

6    Ardoin's would be number -- number one.  Any objection to doing

7    that?

8              **MR. COCHRAN:**  No, your Honor.

9              **MS. RAYNOR:**  No, your Honor.

10             **MR. MCGUIRE:**  No, your Honor.

11             **MR. GLADDEN:**  No, your Honor.

12        **(Government's Exhibit Numbers 2, 3, 4, and 5 were received**

13   **into evidence.)**

14             **THE COURT:**  Okay.  I know you'll have when it's time,

15   in no way just cause we're admitting it, are you admitting the

16   truth of it.  Like yesterday, if you have objections, we can

17   get into that.

18             So go ahead, sir.

19             **MR. COCHRAN:**  Right.  That -- that was going to be my

20   only objection.  We're not stipulating to the truth or accuracy

21   at this point.

22             **THE COURT:**  Exactly.

23             We're just admitting it so that way both sides you

24   want to proffer to the positive information and that you can do

25   it without having to put evidence into the record.  But in no

1  way by you not objecting to the admission are you stipulating

2  to everything in there.

3          **MR. COCHRAN:**  Okay.

4          **MR. MCGUIRE:**  Well we have the same request, your

5  Honor.

6          **THE COURT:**  Okay.

7          So if that -- with those, you're fine with us

8  admitting it for the limited purpose that people can proffer

9  what they want out of it.

10         **MR. MCGUIRE:**  Yes, sir.

11         **MS. RAYNOR:**  Yes, your Honor.

12         **THE COURT:**  Okay.  Thank you.

13         Okay.  Go ahead, Miss Collins.

14         **MS. COLLINS:**  Yes, your Honor.

15         I'd call Detective Adam Bock to the stand.

16      **(Pause in the proceeding.)**

17         **MR. COCHRAN:**  Your Honor, I do have --

18         **THE COURT:**  Sure.

19         **MR. COCHRAN:**  -- one question about -- we may call a

20  witness.  Does -- I don't know if the Government wants to

21  invoke the Rule or not.

22         **MS. COLLINS:**  Yes, your Honor.

23         **THE COURT:**  Okay.  Okay.

24         So, is -- is the witness -- you -- you're talking

25  about a witness as to the probable cause or a witness as to the

1  detention hearing?

2      **MR. COCHRAN:**  As to detention, your Honor.

3      **(Voices whispering off the record.)**

4      **THE COURT:**  So, Miss Collins, do you really care if

5  the witness is here if -- if it's as to the detention, not the

6  probable cause?

7      **MS. COLLINS:**  I -- I don't feel strongly either way,

8  your Honor.

9      **THE COURT:**  Okay.  I'll let the -- because it's a

10  detention hearing and I'll let the witness stay.

11      **MR. COCHRAN:**  Thank you.

12      **THE COURT:**  Who's the witness?  Is it a family

13  member?

14      **MR. COCHRAN:**  Yes, it is.

15      **THE COURT:**  Okay.

16      **MR. COCHRAN:**  It's Evie (phonetic) Turner.

17      **THE COURT:**  Okay.  That's fine.

18      Okay.  Go ahead.

19      **CASE MANAGER JONES:**  Will you raise your right hand,

20  please?

21      **(Witness sworn.)**

22      **CASE MANAGER JONES:**  You may be seated.

23      **(Pause in the proceeding.)**

24      **MS. COLLINS:**  Your Honor, I hate to go out of order

25  for --

 1           **THE COURT:**  Sure.

 2           **MS. COLLINS:**  -- what the Court requests.

 3           **THE COURT:**  Sure.

 4           **MS. COLLINS:**  With the understanding that Evie Turner

 5   will be testifying.  I do have additional questions for Adam

 6   Mock -- Adam Bock concerning her specifically.

 7           Would it be possible to go ahead and ask those along

 8   with swearing him in for the proffer.

 9           **THE COURT:**  Okay.  You were asking -- since the first

10   thing that you said again was what?

11           **MS. COLLINS:**  Sorry.

12           With the knowledge that they're going to be calling

13   Evie Turner --

14           **THE COURT:**  Okay.

15           **MS. COLLINS:**  -- who I believe is Jcoi Barley's

16   mother.

17           **THE COURT:**  Gotcha.

18           **MS. COLLINS:**  I would have additional questions

19   outside of the proffer concerning her specifically.

20           **THE COURT:**  That's perfectly fine.

21           **MS. COLLINS:**  Thank you, your Honor.

22                         **DIRECT EXAMINATION**

23   **BY MS. COLLINS:**

24   Q    Please state your name for the record.

25   A    My name is Adam Bock, B-o-c-k.

1   Q    And what do you do for a living?

2   A    I'm a detective with the Houston Police Department and I

3   am sworn as a federal agent for the FBI.

4   Q    All right.  Prior to coming to court today, did you have

5   an opportunity to read both the proffer as well as the revised

6   proffer that's been submitted in this case?

7   A    I did.

8   Q    And with regard to that proffer, did you confirm its

9   accuracy to the best of your knowledge as to each of the facts

10  stated in the proffer?

11  A    I did.

12  Q    All right.

13       Additionally, how long have you been conducting this

14  investigation into the Free Money Gang?

15  A    This specific investigation of Free Money has been

16  occurring since around May of this year.

17  Q    All right.  During that period of time, were you what we

18  call up on a phone or intercepting phone communications of Jcoi

19  Barley?

20  A    I was.

21  Q    For approximately how many months?

22  A    Three months.

23  Q    During that period of time, were you able to listen to

24  phone calls between Jcoi Barley and Evie Turner?

25  A    I was.

1   Q    And who is Evie Turner?

2   A    That is Jcoi Barley, his mother.

3   Q    All right.  During the period of intercept and listening

4   to those phone calls between the two, was there anything of

5   note concerning Jcoi Barley's use of his mother with regard to

6   the probation system?

7   A    Yes.  For, I believe it was in July of this year, Jcoi was

8   assigned I think a new parole officer or a parole officer.  On

9   his first meeting with -- intended meeting with the parole

10  officer, he told his parole officer that today -- the day was

11  not a good day for the parole officer to come because he had to

12  take his mother to the hospital.  He then called his mother,

13  told her what he had told the parole officer, and asked her to

14  go along with it.

15  Q    And did she agree to lie to the parole officer should he

16  call on behalf of her son?

17  A    She did.

18  Q    Additionally, were there conversations between Jcoi Barley

19  and his mother, Evie Turner, concerning the use of false urine

20  to get around testing?

21  A    Yes.

22  Q    Can you tell us about that?

23  A    On multiple occasions, Defendant Barley stated to his

24  mother that he had to take a piss test, or a urine test, and

25  that he was using either fake urine or a drug that supposedly

1   removes the THC from your system in time for a urine test.

2   Q    What was his mother's response to him telling him he was

3   basically falsifying records and falsifying his -- his test

4   results.

5   Q    It was mostly just a --a son telling his mother what's

6   going on in his life.  There was, however, no objection to his

7   behavior.

8            **MS. COLLINS:**  With that, your Honor, I would pass the

9   witness and --

10           **THE COURT:**  Sure.

11           **MS. COLLINS:**  -- tender as you've already done.

12           **THE COURT:**  So let me -- on -- on that point,

13  Mr. Cochran, we can -- when we get to it, we can -- we don't

14  have to discuss it now.  But I do want to make sure that --

15  that you -- you represent Mr. Barley and not her.

16           **MR. COCHRAN:**  Right.

17           **THE COURT:**  And -- and I don't want her to get on the

18  stand and subject herself to -- so -- so we'll -- we'll deal

19  with it at that point.  But I probably will Mirandize her just

20  so she understands that she doesn't have to testify.  And

21  that -- that what she says could be used against her in some

22  other proceeding.

23           And so I -- I do not want her, for the sake of trying

24  to help her son, to hurt herself.  And so --

25           **MR. COCHRAN:**  And -- and I suspect she would probably

1  meet criteria for court-appointed counsel, if need be, which is

2  another complication.

3          **THE COURT:**  Right.

4          **MR. COCHRAN:**  So I may have -- I may have to

5  rethink --

6          **THE COURT:**  Okay.  Cause a lot of times -- and I

7  think you all, if you spoke to the attorneys yesterday, you

8  don't realize, and probably the Defendants don't either, that

9  there was wire intercepts going on and -- and calls being

10 recorded.

11          And so how you may think the evidence was one way,

12 it's -- it's really another way.

13          But --

14          **MR. COCHRAN:**  Sure.

15          **MS. COLLINS:**  Your Honor?

16          **THE COURT:**  Go ahead.

17          **MS. COLLINS:**  May I make the suggestion for

18 efficiency sake and for everyone's rights being upheld that

19 perhaps defense counsel can simply proffer what she would say

20 as opposed to putting her on the stand.

21          **THE COURT:**  Right.

22          And -- and I would advise -- that's always what I

23 think people should do.  But you all, I can't tell you what to

24 do.  But I've just never seen it work well.

25          But -- but you can do what you want to do.

1          **MR. COCHRAN:**  All right.

2          **THE COURT:**  Okay.  So let me do this.

3          I don't care where people stand.  Just the only thing

4  that I need you all to do when you talk is speak in the

5  microphone.  Because if you don't speak in the microphone, we

6  don't get a record.  So whether defense counsel, it's perfectly

7  fine sitting, standing, just be speak in the microphone.

8          Who wants to -- who wants to go first?

9          **MR. COCHRAN:**  On -- on that particular topic, I

10  suppose I should go first because of the topic.

11          **THE COURT:**  Okay.

12          **MR. COCHRAN:**  So --

13          **THE COURT:**  Just introduce yourself and your client

14  for the record.

15          **MR. COCHRAN:**  All right.

16                        **CROSS EXAMINATION**

17  **BY MR. COCHRAN:**

18  Q    I'm Winston Cochran.  And I -- I represent Mr. Barley

19  in -- in this case.

20  A    Good morning.

21          **(Pause in the proceeding.)**

22  **BY MR. COCHRAN:**

23  Q    You're saying that you have --

24          **THE COURT:**  Is that microphone on?  Can you see to

25  make sure.

1          **MR. COCHRAN:** Oh, it's not on.

2       **(Voices speaking off the record.)**

3       **(Pause in the proceeding.)**

4          **MR. COCHRAN:** Is that better?

5          **THE COURT:** Yeah. It's perfect.

6       **(Pause in the proceeding.)**

7    **BY MR. COCHRAN:**

8    Q    You said that for several weeks, if not months, you were

9    listening in -- listening to phone calls where you say

10   Mr. Barley claimed that he was basically committing narcotics

11   use violation; is that a fair summary of what you're telling

12   the Court?

13   A    Yes.

14   Q    You were aware he was on parole; isn't that correct?

15   A    Yes.

16   Q    Did you ever tell the Parole Division of the Texas

17   Department of Criminal Justice about any of this?

18   A    No.

19   Q    Well, in fact, if you had, they could have issued what's

20   known as a blue warrant. In other words, to -- to detain him.

21         **MS. COLLINS:** Objection to speculation as well as

22   relevance, your Honor.

23         **MR. COCHRAN:** Well, I --

24         **THE COURT:** Right. I mean, the -- I -- I --

25         **MR. COCHRAN:** -- I think as a police officer. He'd

1  know that.

2        THE COURT:  I know, but this is -- we're getting way

3  out of the -- I'll let you ask one more question.  But this has

4  nothing to do with the probable cause.

5        I mean, there's either probable cause or not.  And --

6  and that goes to his credibility that's for another day.  But

7  it really doesn't go to the probable cause in this case.

8        MR. COCHRAN:  Really it goes more to the -- to the

9  detention.

10        THE COURT:  Okay.

11        MR. COCHRAN:  Should I -- should I just finish up the

12  question?

13        THE COURT:  Yes, you can finish this question.

14        MR. COCHRAN:  All right.

15  BY MR. COCHRAN:

16  Q    The fact of the matter is that if you had contacted them

17  and a blue warrant had been issued, then it would not have been

18  possible for him even to be accused of all these recent events

19  in August; isn't that true?

20  A    If the blue warrant was arrested?  Or it was issued?

21  Q    If -- if they -- if they had executed a blue warrant upon

22  him in May or June, none of these allegations against him from

23  August would have been possible, correct?

24  A    That would depend on his arrest after a blue warrant was

25  issued.

1  Q    Well that would be prompt, wouldn't it?

2  A    No.

3  Q    Why do you say that?  You don't think TDC enforces their

4  blue warrants promptly?

5         **MS. COLLINS:**  Your Honor, I'm going to again object

6  to relevance at this point.

7         **THE COURT:**  Again, just answer this one question then

8  let's move on.

9         **THE WITNESS:**  It is normal for people to have blue

10  warrants for months, if not a year.

11         **MR. COCHRAN:**  No further questions.

12         **THE COURT:**  Okay.  Who wants to go next?

13         **UNKNOWN MALE:**  For Mr. -- Terry (phonetic) Brookline

14  (phonetic) I don't have any questions of this witness, Judge.

15         **THE COURT:**  Okay.  Who wants to go next?

16         **MR. MCGUIRE:**  I'll be ready to go, your Honor.

17                      **CROSS EXAMINATION**

18  **BY MR. MCGUIRE:**

19  Q    Detective --

20         **THE COURT:**  Can -- can you just introduce for the

21  record so that --

22         **MR. MCGUIRE:**  Yes, your Honor.  Ken McGuire for

23  Mr. McLendon.

24      **(Pause in the proceeding.)**

25  //

1   **BY MR. MCGUIRE:**

2   Q    Detective, you mentioned that you were listening to Title

3   3 wire taps for about three months before the arrest in this

4   case; is that correct?

5   A    Yes, sir.

6   Q    So there were three authorizations?

7   A    There are three separate authorizations --

8   Q    Okay.

9   A    -- yes, sir.

10  Q    Now can you tell us when -- were you involved in the pole

11  camera surveillance?

12  A    Yes.  Amongst other people, but yes.

13  Q    Was that an HPD pole camera?

14  A    At first it was an -- well, we utilized multiple pole

15  cameras.  I believe the pole camera you're referencing is the

16  one that was on XXXX XXXXXX.

17  Q    Yes.

18  A    Okay.  At first, that was an ATF pole camera.  It was

19  changed to an HPD pole camera some time in, I believe,

20  September.

21  Q    September of --

22  A    This year.

23  Q    -- this year.

24  A    Of 2022.

25  Q    Okay.  So the pole camera was operating even after the

1  arrest of the Defendants?

2  A    Yes.

3  Q    Okay.  When did the pole camera surveillance start?

4  A    I -- I'm not -- I'm not sure what date it started.  I

5  became aware of the -- of its existence on July 18th of this

6  year.

7  Q    Was that before the Title 3 authorizations were granted?

8  A    That was the first day that we flipped the switch, so to

9  speak, or we had served the authorization paperwork -- the

10 order to the service provider company.

11 Q    Okay.  Are you talking about the Title 3 wiretap?

12 A    Yes.

13 Q    Okay.  And the pole camera, was that initiated before the

14 Title -- the first Title 3 wiretap?

15 A    It existed prior to.

16       I, however, our team did not have knowledge of its

17 existence until that date specifically.

18 Q    Was that an ATF pole camera before then?

19 A    It was still an ATF pole camera up to that point, yeah.

20 Q    Up to that point.  Okay.

21       So just to be clear, the pole camera surveillance did

22 start before the first T3 authorization was made?

23 A    Yes.

24 Q    Okay.  And that's on the XXXXXX address?

25 A    Yes.

1  Q    Okay.  And you mentioned other pole cameras, what are the

2  other pole cameras that are involved?

3  A    For example, we had another pole camera at the England

4  location, 6511 England.

5  Q    Is that the trap house?

6  A    Yes.

7  Q    And can you explain what a trap house is?

8  A    A trap house is just a kind of a -- a slang street name

9  for a location or generally a residence or apartment that is

10 primarily used for the sale of narcotics.

11 Q    Okay.  Do you know when that pole camera start -- started?

12 A    I don't.  I became aware of its existence I believe in May

13 of this year.

14         **(Pause in the proceeding.)**

15 **BY MR. MCGUIRE:**

16 Q    Was that also an ATF pole camera?

17 A    That is an HPD pole camera.

18 Q    That was an HPD pole camera.

19         And you -- was there any other pole cameras besides

20 those two?  You mentioned three --

21 A    Yeah.  I'm not --

22 Q    -- pole cameras, I think.  I didn't hear you right.

23 A    I'm trying to think for this investigation.

24         There's a -- a -- where I work focuses on violence in

25 the southeast.  And they are the ones that generally put up the

 1  pole cameras.  They're targeted on not just Free Money, but

 2  other gangs as well.  And I'm -- I'm trying to think.  Just to

 3  make sure that I articulate the facts properly --

 4  Q    Sure.

 5  A    -- with what cameras we utilized.

 6          I believe those are the only two pole cameras that we

 7  utilized in this investigation.

 8  Q    You think there were two.

 9  A    Two.

10  Q    Okay.

11  A    Yeah.

12  Q    And you just, just to make sure I'm clear on the record,

13  that the trap house pole camera, and that was Lincoln Street I

14  believe you said?

15  A    England.

16  Q    England.  I'm sorry.

17  A    Yes, sir.

18  Q    That began as far as you know in May, 2022.

19  A    I -- I became aware of its existence at that time.

20  Q    So it was at least in existence starting in May.

21  A    At least.  Yes, sir.

22  Q    And that was before any T3 authorization?

23  A    Yes, sir.

24  Q    Okay.  Do you know whether any information from the pole

25  camera was in the T3 applications?

1   A    It was.

2   Q    It was.

3   A    Yes, sir.

4   Q    Okay.

5        **(Pause in the proceeding.)**

6   **BY MR. MCGUIRE:**

7   Q    Okay.  Was there any pole camera up on the T.C. Jester

8   address?

9   A    Yes, there was.  Thank you.

10  Q    Oh, there was.  Okay.

11  A    Yes, there was.

12  Q    So that's the third pole camera.

13  A    Well, that camera is focused on not Free Money but the

14  rival gang --

15  Q    Okay.

16  A    -- of Free Money.

17       So that camera came in use when -- for the August

18  14th event.  But other than that one day, and -- and really

19  there wasn't much captured on it.  It's referenced in the

20  proffer to state that we were already aware that that was a

21  Purple Heart Gang location.

22  Q    Okay.  And do you know when that T.C. Jester pole

23  camera --

24       **MS. COLLINS:**  Your Honor, I'm going to have to object

25  to relevance.  As it's stated, this isn't even a pole camera on

1    anyone involved in this case.

2              **THE COURT:**  I'll -- I'll let him answer the question.

3    Overruled.

4              **THE WITNESS:**  Again, I became aware of its existence

5    on that date.  I -- I don't know when it was put up.

6    Q    And that date was?

7    A    August 14th, 2022.

8    Q    Okay.  So that would have been substantially after the 90

9    days of T3 surveillance.

10   A    Yes, sir.

11   Q    Was that an ATF pole camera or HPD?

12   A    That's an HPD pole camera.

13   Q    HPD.  Okay.

14   Q    Do you know for any of the pole cameras was there any kind

15   of warrant obtained for the installation of those?

16   A    I don't believe so.

17   Q    Okay.

18        **(Pause in the proceeding.)**

19   **BY MR. MCGUIRE:**

20   Q    Now you say you were monitoring the -- the title for

21   intercepts.  Was that for the full three -- three months

22   yourself?  Or?

23   A    No.  So we had a team of -- of monitors --

24   Q    Okay.

25   A    -- that actually listened to and minimized the calls.

1  Q    Okay.  How many times is Mr. McLendon captured on those T3

2  intercepts?

3  A    Maybe 50 if I had to rough guess.

4  Q    Fifty.

5  A    Maybe.

6  Q    Okay.  Uh --

7       **(Pause in the proceeding.)**

8            **MR. MCGUIRE:**  No further questions, your Honor.

9            **THE COURT:**  Okay.  And then, Miss Raynor.

10           **MS. RAYNOR:**  Thank you.

11                        **CROSS EXAMINATION**

12 **BY MS. RAYNOR:**

13 Q    Good morning, Special Agent Bock.  My name is Joyce

14 Raynor.  I'm representing Terrell Davis in this case.

15          You testified earlier that you had reviewed the --

16 the Government's proffer for its accuracy.

17 A    Yes, ma'am.

18 Q    Okay.  Can you -- Mr. Davis has been charged also with

19 possession of a machine gun.

20 A    Yes, ma'am.

21 Q    Can you find for me, cause these glasses don't work all

22 the time, can you find for me in the proffer where any evidence

23 to where he possessed a machine gun.

24 A    Yes.  Let me review quickly.

25       **(Pause in the proceeding.)**

1          **THE WITNESS:**  The evidence is -- I don't -- there's

2    not a page number.

3    **BY MS. RAYNOR:**

4    Q    If it's this -- the file-stamped copy of the proffer, look

5    at the top of the proffer maybe the page would be there.

6    A    I -- I don't have one on --

7    Q    Okay.

8    A    -- on my copy.

9          It -- but it's during the area where in the first

10   paragraph is states that "Davis was located with a magazine

11   with ammunition on his person."  And then in the next paragraph

12   it states that there was a Glock with a switch, which is a

13   machine gun, which was found lying along the path, or in the

14   direction, that Defendant Davis ran.

15        **(Pause in the proceeding.)**

16   **BY MS. RAYNOR:**

17   Q    Can you count the page and tell me?  Was that page 10, 11,

18   12?

19   A    Yes, ma'am.

20        **(Pause in the proceeding.)**

21          **THE WITNESS:**  Page eight.

22        **(Pause in the proceeding.)**

23          **MS. RAYNOR:**  Your Honor, may I approach the witness?

24          **THE COURT:**  Sure.

25          **MS. RAYNOR:**  Thank you.  I'm sorry.

1        **(Counsel approaches the witness.)**

2    **BY MS. RAYNOR:**

3    Q    Can you show me?

4    A    Yes, ma'am.

5        **(Pause in the proceeding.)**

6    **BY MS. RAYNOR:**

7    Q    It's not this page.

8    A    Okay.

9        **(Pause in the proceeding.)**

10        **THE WITNESS:**  Well it would be after this.

11        **(Pause in the proceeding.)**

12        **THE COURT:**  So there may be a confusion.

13        I think you may be referring to the -- are you

14    referring to the criminal complaint, the affidavit?  And he's

15    referring to the proffer?

16        **MS. RAYNOR:**  Probably, yes, Judge.

17        **THE COURT:**  If you -- Miss Collins, look what she

18    has.  I think she may have the affidavit and he's referring to

19    the proffer.

20        **MS. RAYNOR:**  Affidavit -- I'm referring to the

21    affidavit.

22        **MS. COLLINS:**  Yes, your Honor.  This is the

23    complaint.

24        **THE COURT:**  Right.  So -- so that's different than

25    his proffer.

1          **MS. RAYNOR:**  Okay.  So I didn't -- maybe -- yeah.

2          **MS. COLLINS:**  Do you need to find it in here.

3          **MS. RAYNOR:**  Yeah.

4          **MS. COLLINS:**  We should be able to find it.

5          **MS. RAYNOR:**  I want to get the record and put it on.

6      **(Counsel confers off the record)**

7          **MS. RAYNOR:**  Yeah.  That's it.

8      **(Pause in the proceeding.)**

9          **THE COURT:**  It -- it's page eight on the proffer.

10  There's no page numbers.  But if you manually count them, it's

11  page eight.

12      **(Pause in the proceeding.)**

13          **MS. COLLINS:**  All right.  The pages are a little out

14  of order.

15      **(Pause in the proceeding.)**

16      **(Voices whispering.)**

17  BY MS. RAYNOR:

18  Q    Okay.  So on page eight of the proffer --

19          **THE COURT:**  Just make sure you speak into a

20  microphone, Miss Raynor.

21          **MS. RAYNOR:**  Thank you, judge.

22      **(Pause in the proceeding.)**

23  BY MS. RAYNOR:

24  Q    Oh, so you just testified that on page eight of the

25  proffer it states that a Glock with a switch without a magazine

1   was found lying in the direction of where Davis ran.

2   A    Right.

3   Q    Do you know how far away from him it was?

4   A    From his person it was maybe 40 feet.

5   Q    Forty feet?

6   A    Uh-huh.

7   Q    Would that be like from here to the -- that door or

8   further?

9   A    Maybe a little further.

10  Q    And you said it was in the -- in the pathway.

11  A    Yes.

12       **(Pause in the proceeding.)**

13  **BY MS. RAYNOR:**

14  Q    Has -- has -- has -- since the time of his arrest, has any

15  prints been run on that particular gun?

16  A    That gun has been processed for DNA and fingerprints.

17  There is not any reports yet back from the lab.

18  Q    Okay.

19       **(Pause in the proceeding.)**

20       **MS. RAYNOR:**  Okay.  No further questions for this

21  witness, your Honor.  Thank you.

22       **THE COURT:**  Okay.  Miss Collins?

23       **MS. COLLINS:**  Brief redirect, your Honor.

24       **THE COURT:**  Sure.

25       **(Voices speaking off the record.)**

**REDIRECT EXAMINATION**

**BY MS. COLLINS:**

Q    You were just asked about Terrell Davis and the firearms that were found at his crash scene.  I knew you testified about this yesterday, but for clarification today.

Along with the officers that were on scene, were there also two separate helicopters monitoring what was happening at each of the crime scenes?

A    There was one helicopter and one fixed wing airplane.

Q    All right.  And since I clearly don't understand what that difference is, could you explain that to us?

A    A helicopter is being a helicopter.  And a -- a -- what we call a fixed wing is a mere traditional airplane, not one that has a rotary wing.

Q    All right.  Did each of those have camera -- cameras monitoring what was happening below them?

A    They did.

Q    All right.  For clarification, how many individuals were in the vehicle that Terrell Davis was in?

A    Four.

Q    All right.  And did the helicopter capture all four individuals fleeing from the vehicle?

A    It did.

Q    Including the path of direction where they ran?

A    Yes.

1  Q    All right.  In the direction where -- well let me back up

2  a little bit.

3           How many firearms were recovered at that crash scene?

4  A    Three.

5  Q    Of those three firearms that were recovered, how many of

6  them had Glock switches on them?

7  A    All three of them.

8  Q    All right.  And for purposes of anyone who may not be

9  familiar with Glock switches, can you just briefly describe

10 what that means and what it does to a firearm?

11 A    Yes.  A Glock switch is kind of a -- it's a slang term, a

12 nickname, for -- its -- its technical name is a SERE, s-e-r-e.

13          That is when applied to the firing mechanism of a

14 firearm, it converts it from being a semi-automatic firearm to

15 a fully automatic firearm.  In the case of a -- a pistol, or a

16 Glock switch sere, they're generally 3-D printed and applied to

17 the rear of the -- the handgun.

18          You can kind of tell that it's a switch because it --

19 it sticks out from the back -- from the rear of the handgun.

20 Q    All right.  So to be clear, in the direction that three

21 individuals, including Terrell Davis, ran, there are found

22 three firearms all with Glock switches; is that correct?

23 A    Yes.

24 Q    All right.  And again, pursuant to the video helicopter --

25 helicopter video surveillance, were you able to accurately show

1  where Terrell Davis went from the time he left the vehicle to

2  the time that he was taken.

3  A    Yes.

4  Q    And to be clear, the gun that is in question here, the

5  firearm with the Glock switch, was found in that direction of

6  travel; is that correct?

7  A    Yes.

8  Q    You also mentioned that he had a magazine on his person;

9  is that right?

10 A    It is.

11 Q    And was that magazine consistent with the type of firearm

12 that was found with the Glock switch in that direction of

13 travel?

14 A    Yes.

15        **(Pause in the proceeding.)**

16        **MS. COLLINS:**  Nothing further, your Honor.

17        **THE COURT:**  Okay.  Does anybody else on the defense

18 side as to probable cause have any other questions of this

19 witness?

20        **MR. GLADDEN:**  I just have a couple of --

21        **THE COURT:**  Okay.  Go ahead.

22        **MR. GLADDEN:**  -- of quick questions, your Honor.

23        **THE COURT:**  For the record, that's Mr. Gladden.  And

24 Mr. Gladden represents Terry Ardoin.

25        **MR. GLADDEN:**  Yes, your Honor.

1      **THE COURT:**  Just make sure you speak in the

2  microphone.

3                    **RECROSS EXAMINATION**

4  **BY MR. GLADDEN:**

5  Q    Agent, as far as the Glock switches, there's some

6  information in the proffer that -- that says my client admitted

7  knowledge of those Glock switches; is that correct?

8  A    Yes.

9  Q    Was that admission recorded?

10  A    It was.

11  Q    On like tape recordings or something like that?  Digital

12  recording?

13  A    On a video recording system.  Yes, sir.

14  Q    And I guess as was the Mirandize warnings?  Okay.

15  A    Yes, sir.

16           **MR. GLADDEN:**  Pass the witness.

17           **THE COURT:**  Okay.  Any other questions?

18           **MS. RAYNOR:**  One -- one other question, if you don't

19  mind.

20           Joyce Raynor for Terrell Davis.

21                    **RECROSS EXAMINATION**

22  **BY MS. RAYNOR:**

23  Q    Agent Bock, the helicopter surveillance of the men who

24  left the Chevy Equinox, was that captured on camera or just

25  surveillance?

1   A    It -- it's recorded.

2   Q    It's recorded.

3   A    It will be given over in discovery.

4   Q    Okay.  And of the -- you said there were four men in that

5   Chevy Equinox that night, correct?

6   A    Yes, ma'am.

7   Q    And three of them ran in the same direction?

8   A    Two ran in the same direction.  One ran in a different

9   direction.  And the last one ran in a different direction than

10  the others.

11       So, let me rephrase that.  Two individuals ran in

12  the -- a direction all by themselves.  Two other individuals

13  ran beginning in the same direction of the vehicle.

14  Q    Okay.  And the -- the first two individuals were wearing

15  red clothing, correct?

16  A    The -- the -- from the perspective of the -- of the

17  helicopter, it was utilizing a fleer, which is infrared.  There

18  is no color --

19  Q    Okay.

20  A    -- to the video.

21  Q    Was Terrell Davis in the second two that fled in a

22  different direction from the first two?

23  A    Terrell Davis was the one -- the first person to flee and

24  someone else followed behind him.

25  Q    Okay.

1      **(Pause in the proceeding.)**

2    **BY MS. RAYNOR:**

3    Q    And -- and the -- you say someone else followed behind

4    him.  Who was that someone else?

5    A    That was Jacoby Anderson?

6    Q    Was he charged with possession of a fire -- a machine gun?

7    A    He is not currently charged in this case.

8      **(Pause in the proceeding.)**

9    **BY MS. RAYNOR:**

10   Q    So how do you know that gun didn't belong to him?

11   A    Well the magazine that was on Davis' -- Terrell Davis'

12   person, was actually not just consistent with the make and

13   model.  It was consistent with the color scheme of the gun as

14   well.

15       Most firearms are black from the manufacturer.  Glock

16   specifically manufactures their guns with color selections of

17   different colors.  That firearm happened to be a different

18   color than -- than typical.  The magazine that was on his

19   person was consistent, or a matching color, from the

20   manufacturer, as the actual firearm that was recovered along

21   the path that he ran.

22   Q    All right.

23       **MS. RAYNOR:**  No further questions, your Honor.

24       **THE COURT:**  Okay.

25       **MR. COCHRAN:**  Your Honor, may I -- may I ask a one --

 1            **THE COURT:**  Sure.

 2            **MR. COCHRAN:**  -- based on what his testimony just

 3    was?

 4                    **RECROSS EXAMINATION**

 5    **BY MR. COCHRAN:**

 6    Q    In terms of people who allegedly fled from these vehicles,

 7    my client wasn't in that group, was he?

 8    A    I'm -- remind me who your client is.  I'm sorry.

 9            **THE COURT:**  Jcoi Barley.

10    **BY MR. COCHRAN:**

11    Q    Mr. Barley.

12    A    No.  Jcoi Barley was not there when this occurred.

13    Q    Thank you.

14    A    Yes, sir.

15        **(Pause in the proceeding.)**

16            **MR. MCGUIRE:**  Very briefly if --

17            **THE COURT:**  Sure.

18            **MR MCGUIRE: --** I may, your Honor.  For -- Ken McGuire

19    for Mr. McClendon.

20                    **RECROSS EXAMINATION**

21    **BY MR. MCGUIRE:**

22    Q    Detective, after Mr. McLendon was arrested, was he -- was

23    a custodial interview made of him?

24    A    Yes.  We had a custodial interview with your client.

25    Q    Was that -- did he invoke his rights?

 1  A    He waived his rights.

 2  Q    He waived his rights.  Did he give a custodial statement?

 3  A    He did.

 4  Q    Is it recorded?

 5  A    It is.

 6  Q    And that -- where was that done?

 7  A    At the FBI headquarters.

 8  Q    At the FBI headquarters.

 9  A    Yes, sir.

10  Q    Okay.  Did he make incriminating statements?

11  A    I don't -- I don't believe so.

12  Q    Okay.

13  A    Maybe small things.  But, I mean, he didn't state that,

14  you know, he had done this, or anything major like that.

15  Q    Okay.  But the entire interview was recorded.

16  A    Yes, sir.

17  Q    Okay.  Thank you.

18          **MR. MCGUIRE:**  Nothing further, your Honor.

19          **THE COURT:**  Okay.  So let's do this.

20          We'll move on to the detention aspect.  We'll start

21  with you, Mr. Cochran, since -- so you all know this is a

22  presumption case.  So it's -- it's your all burden.  So you'll

23  start.

24          What I'd like to do is you tell me what -- if you

25  want to proffer, if you want to call his mother.  And then when

1  you're done, you'll make your argument.  Well, we'll do all the

2  arguments last.

3        Let's start with -- how do you want?  Do you want to

4  call your witness or do you want to proffer?

5        **MR. COCHRAN:**  May I confer with my client?

6        **THE COURT:**  Sure.

7     **(Pause in the proceeding.)**

8     **(Counsel confers with Defendant Barley.)**

9        **THE COURT:**  Okay.  Mr. Cochran?

10       **MR. COCHRAN:**  All right.  Thank you, your Honor.

11       After conferring with my client, let -- let me just

12  go ahead and make a proffer.

13       **THE COURT:**  Okay.  Can you speak in the microphone so

14  we can hear?

15    **(Pause in the proceeding.)**

16       **MR. COCHRAN:**  That if we were to present evidence, it

17  would show number one, that within Mr. Barley's family, his

18  presence at home would be beneficial because number one, he has

19  a grandfather who's ill, serious illness, cancer.

20       And that being able to help provide for him is

21  important.  They're -- they're not a -- a wealthy family.  So

22  they can't give up work opportunities to stay at home.  And so

23  having him there would be beneficial.  He also, although there

24  was a mention, that he doesn't have any children himself.  He

25  has, in fact, helped take care of children with his girlfriend,

1    who's not currently -- they're -- they're not married.  But

2    that's pretty common nowadays.  So that's not a strike against

3    anybody, I would say.

4           But he does have a -- a relationship in terms of

5    helping to provide care for children as well.  So in the sense

6    of those being strong family ties, reason to expect him to

7    stay, that's what we would -- would be showing.

8           **THE COURT:**  Okay.  Thank you.

9           Mr. McGuire?

10          **MR. MCGUIRE:**  Yes, your Honor.

11          For Mr. McLendon, your Honor, we requested that

12   Mr. McClendon's father, Jimmy McClendon, who is here in the

13   courtroom today, be interviewed by Pretrial yesterday.

14   Mr. McClendon, Senior is willing to serve as a third-party

15   custodian for his son.  He's willing to surveil him and enforce

16   whatever conditions the Court might set for his son if the

17   Court were to grant him a release.

18          Mr. McClendon, Senior and Junior, they are lifetime

19   Houston residents.  So I think risk of non-appearance is

20   relatively low, you know.

21          As far as danger to the community, Mr. McClendon,

22   Senior stated that he is willing and -- and -- he's willing to

23   be interviewed by the Court or answer any questions the Court

24   may directly have.

25          He is willing to have his son live with him at his

1  home.  He is willing to enforce any conditions of release set.

2  And notify the Court if his son did not meet any conditions

3  set.

4          And he would like to try to serve as a stronger

5  influence on his son to change his ways.  He's still a

6  relatively young man.  He doesn't have a very serious history

7  at this point.  And Mr. McClendon doesn't have a -- really any

8  significant history at all.  As the Court can see in the

9  report, it's very old.  The little history he has is over 22

10  years old I think at this point.

11          And anyway, the -- your Honor, the -- just wanted to

12  let the Court know that Mr. McClendon is here and he is willing

13  to serve as a custodian for his son.

14          **THE COURT:**  Okay.

15          **MR. MCGUIRE:**  If the Court would grant conditions.

16          **THE COURT:**  I'll have you respond after everybody,

17  Miss Collins.

18          Greg Gladden on behalf of Terry Ardoin?

19          **MR. GLADDEN:**  Yes, your Honor.  Thank you.

20          Present in the courtroom today is Terry Ardoin,

21  Senior and -- my client's father and his mother, Demetria

22  Ardoin, and his girlfriend, who's pregnant with his child as

23  referenced in the Presentence Report or the Presentence Report,

24  not quite there yet, at the Preliminary Report by the Probation

25  Office, Camery (phonetic) Powell (phonetic.)

1          If I called them to testify, they would confirm that

2   they had seen the relevant portions of the proffer, Probable

3   Cause Proffer, where it talks about Terry's involvement or

4   alleged -- alleged involvement in this case, and the extraneous

5   offenses that are mentioned, and the statements he may have

6   made, all of which are serious.

7          But even in light of those allegations, they would

8   all, if they testified, they'd advise the Court they did not

9   believe he would be a danger to the community or a flight risk

10  if he was allowed conditions of bond that would be appropriate

11  in this case.

12         We would ask the Court to consider, in light of this

13  seriousness of these allegations, usually a restrictive

14  conditions might be appropriate and -- and we believe would be

15  sufficient to satisfy the -- the ends of getting him back to

16  court and protecting the community, which would involve home

17  arrest with GPS monitoring, where he could live with his mother

18  and father.

19         They would also -- the Pretrial Report suggests that

20  his mother is somehow not qualified to be a custodian because

21  of some, I think, 12-year old marijuana case or something.  I

22  don't remember the specifics.  But they -- they say she's --

23  she qualifies except for that probation she got back in, I

24  don't know, 2008 or something.

25         I think she should qualify as a custodian.  And

1   according to --

2           **THE COURT:**  Let -- let me just ask you this

3   Mr. Gladden.

4           Regarding -- regardless of anything I was to do, he

5   faces parole violations and -- and warrants for -- for the

6   state cases.  So -- so, I mean, on the federal side it -- it's

7   really --

8           **MR. GLADDEN:**  I would need to deal with that at the

9   state level.

10          **THE COURT:**  Yeah.  I, I mean, right.  I mean, they --

11          **MR. GLADDEN:**  I'm not -- I'm not sure if he's on

12  parole.

13          **THE COURT:**  I show February 13, 2020 conviction, 4

14  years deferred adjudication.  Had a -- was on bond, then it was

15  revoked.  And then there was the next court date of December 6.

16          **MR. GLADDEN:**  My understanding is there's a Motion to

17  Revoke, which may be a little different than it being revoked.

18          **THE COURT:**  Yeah.  Okay.

19          **MR. GLADDEN:**  And so deferred is not conviction.

20          **THE COURT:**  Okay.

21          **MR. GLADDEN:**  I mean, I -- I would -- I would need to

22  deal with that obviously.  And he may not -- he may just be

23  changing locations and still be in custody.

24          But --

25          **THE COURT:**  Right.

1    **MR. GLADDEN:** -- we would ask the Court to consider

2  home arrest and allow him to take care of his other business.

3  And I might be able to help him with that.

4          **THE COURT:** Right.

5          **MR. GLADDEN:** And I think that's all I have.

6          **THE COURT:** Okay.

7          And lastly, Miss Raynor?

8          **MS. RAYNOR:** Your Honor, I would proffer the

9  statement from Mr. Terrell Davis' mother, Tara (phonetic)

10  Davis, who's been -- she's asking the Court to release her son

11  and release him in her custody and care as a third-party

12  custodian.

13          Pretrial interviewed Miss Davis. And found that she

14  had had -- she's been a pillar of the community all her life.

15  Had -- but they didn't have her criminal background. And she

16  has none. So that's not stated in the report. So that's one

17  of the quote/unquote facts that are not true.

18          That she has no criminal record, and that she would

19  be willing to, you know, report to the Court and do anything

20  that a third-party custodian would -- would have to do in order

21  to assure her son returns to the Court and make his court

22  appearances.

23          Mr. Davis has no history of not reporting to court.

24  And has very little criminal history as well, your Honor. So

25  we would proffer her statement and -- and state the any type of

1   monitoring, since he's working.  He has a job, he can pay for,

2   and be in the care and custody of his mother at her home.

3           **THE COURT:**  Okay.

4           Miss Collins, why don't you start with Mr. Barley.

5           **MS. COLLINS:**  Your Honor, in light of the proffers

6   given and Mr. -- Detective Bock is still on the stand.  Would

7   it be possible to respond via questioning and -- and with some

8   additional information about each of those?

9           **THE COURT:**  Sure.

10                       **REDIRECT EXAMINATION**

11  **BY MS. COLLINS:**

12  Q    All right.  Obviously, understanding that you're still

13  sworn in Detective Bock, I want to specifically start with

14  Terrell Davis.

15          Throughout the course of our investigation, were you

16  aware of whether or not Terrell Davis was previously on a GPS

17  monitor?

18  A    Yes.  During -- during this investigation and during our

19  intercepts, he was assigned in the state of Texas to be on a

20  GPS monitor.

21  Q    All right.  In fact, on the night of August 14th when he

22  was taken into custody did he, in fact, have an ankle monitor

23  on if you recall?

24  A    I -- I'm not -- I'm not sure if he had one at that point.

25  Q    All right.  Well let's talk about the second time he was

1    taken into custody last Friday on this arrest.  At that time

2    did he have an ankle monitor on him?

3    A    He did.

4    Q    Despite the conditions of the Court, on the date that he

5    was found, did he have drugs in the vehicle that he was

6    driving?

7    A    He did.

8    Q    And additionally, throughout the period of this

9    investigation, did you have an -- an opportunity to monitor

10   Terrell Davis?

11   A    I did.

12   Q    Eyes on him in other words.

13   A    Yes.

14   Q    All right.  During the course of that time, to be fair,

15   did you see him interact with family during the course of your

16   surveillance?

17   A    Yes.

18   Q    Were they essentially a part of his life during the entire

19   period of this investigation?

20   A    They were.

21   Q    Despite that fact, during that time period where they were

22   still part of his life, were you able to intercept calls of

23   Terrell Davis?

24   A    Yes.

25   Q    And in those calls was he discussing the sale of drugs?

1    A    He was.

2    Q    Was this before and after the August 14th incident?

3    A    We were intercepting after the August 14th incident.

4    Q    So after he's been released on that bond, you're

5    intercepting him talking about the sale of drugs.

6    A    Correct.

7    Q    During that same period of time, did you also intercept

8    him talking about the possibility of shooting other

9    individuals?

10   A    Not blatantly in that language.  There was -- he obtained

11   firearms on -- on multiple occasions, discussed having kind of

12   beefs or disagreements with other persons.  But we don't have

13   any calls where he straight up said I'm going to go kill

14   someone.

15   Q    Did you intercept him discussing the best way or places to

16   catch people?

17   A    Yes.  That was prior to the August 14th arrest.

18   Q    Okay.  Can you kind of describe that a little bit more.

19   A    Sure.  During interceptions of Defendant Barley, we had --

20   we intercepted a conversations between Barley and Defendant

21   Davis where they were talking about the rival gang, Purple

22   Heart, and the location where they frequent and can be found,

23   which is commonly known as the dead end.  But it's the 1500

24   block of Salenski (phonetic).

25        And Defendant Davis was talking about -- well say

1    that he had gone by and -- and looked at the location and had

2    devised a plan to sneak up on the persons that were staying

3    there to get a good opportunity to shoot them.

4    Q    All right.  Additionally, with regarding to Terry Ardoin,

5    and to be fair, both he and his brother Travonte, during the

6    course of this investigation did you see them fairly regularly

7    interact with their families?

8    A    Yeah.  So as we're putting surveillance on Terry and

9    Travonte they both frequent their parents' residence.

10   Q    All right.  To be fair, pursuant to what you saw, would it

11   be fair to say that the parents were involved in their sons'

12   lives?

13   A    As far as we saw, yes.

14   Q    All right.

15        **(Pause in the proceeding.)**

16   **BY MS. COLLINS:**

17   Q    And I'll -- I'll just go ahead and ask the same questions

18   for Jcoi Barley.

19        Obviously, we talked about intercepts between he and

20   his mother.  But was she continually involved in his life

21   during the entire period of this investigation?

22   A    She was.

23   Q    Nevertheless, did he continue to engage in the sale of

24   drugs?

25   A    He did.

1  Q    And you said you monitored, excuse me, monitored him

2  approximately three months, can you give us an idea of how

3  often he was engaging in the sale of narcotics.

4  A    On a semi-daily basis.

5  Q    All right.  In the conversation between Jcoi Barley and

6  his mother, were you given any insight into whether or not his

7  mother was able or even willing to want to stop Jcoi Barley's

8  criminal activities?

9         **MR. COCHRAN:**  I'm going to object to hearsay on that.

10        **THE COURT:**  Overruled.

11        **THE WITNESS:**  Jcoi and his mother appeared close.

12 Jcoi would talk about things that was occurring in his life,

13 such as disagreements he was having with other people.

14 Specifically, I mean, credit to her, every mother cares for her

15 son.  She, during the conversations, it appeared that she was

16 willing to let her son vent to her.  There is -- her -- her

17 general response would be I -- I don't know anything about all

18 that.  I -- I mind my own business I think is a direct quote.

19        **(Pause in the proceeding.)**

20        **MS. COLLINS:**  Nothing further, your Honor.

21        **THE COURT:**  Okay.  Nothing further with this.

22        What other argument do you have as to the other four?

23        **MS. COLLINS:**  I -- and I guess for clarification, are

24 you wanting me to argue detention --

25        **THE COURT:**  Well why don't you to start --

1    **MS. COLLINS:**  -- and proceed --

2    **THE COURT:**  Yes.

3    **MS. COLLINS:**  -- at this time?

4    **THE COURT:**  Yes.

5    **MS. COLLINS:**  All right.

6        Your Honor, consistent with the proffers as well as

7    the testimony we've heard today, it is clear that all seven of

8    these individuals, specifically, the four we're here to discuss

9    today, knew, had knowledge of the intent, did plan an operation

10   that was to occur on August 14th.

11       Specifically, three of these individuals, with regard

12   to Terrell Davis, Jcoi Barley, and Terry Ardoin, are caught on

13   phone calls, including Jymonte McClendon in the background, all

14   agreeing to what is about to occur.

15       Despite the fact that Jcoi Barley may not have

16   engaged in getting into a vehicle with a gun does not negate

17   his participation in this conspiracy.  And it's clear from the

18   phone calls we don't have to guess what their -- their plan

19   was.  They tell us.

20       There is a drug dealer.  He is in a home.  They plan

21   on going into that house.  And, Judge, I -- I mean, they are

22   planning on going into a home with guns and masks.  I don't

23   think that we can too strongly discuss how serious that is.

24       **THE COURT:**  No.  I -- I -- I understand that, Miss

25   Collins.  And that's in the proffer.

1    Get for each one the -- the reasons.  I mean, that --

2  that's just one factor for detention.  Just so the record's

3  clear.

4    **MS. COLLINS:**  Absolutely, your Honor.

5    With specifics to each of these individuals, starting

6  with Jcoi Barley.  First and foremost, he is on parole.  We

7  have heard testimony that despite the fact that he is given

8  rules to abide by while he is on parole, he is discussing lying

9  to his parole officer with his mother.  He is discussing trying

10 to hamper the system by giving false urine supplements, on top

11 of the fact that he is then engaging in criminal behavior,

12 specifically with the events on August 14th.

13   With regard to Terrell Davis, again, on June 9th, he

14 has the original carrying a weapon that's currently pending.

15 During that period of time, he's given a GPS monitor.  He's

16 given conditions of his bond.

17   Despite that fact, on August 14th, he is engaging in

18 this.  He is evading from the police.  And he is carrying a

19 firearm.  Again, still on bond for that case once again when

20 he's arrested for this case last Friday, he has narcotics on

21 his person.

22   He has, through his actions, clearly spoken to

23 whether or not he will abide by any conditions that this Court

24 will give him.

25   With regard to Jymonte McClendon, and -- and I have

1   to disagree with defense counsel.  I believe his history is, in

2   fact serious.  We see that he is already at this age had an

3   aggravated robbery where he has served years in TDC.  He has

4   barely been out for that when he gets a -- a felon in

5   possession case just last year.  And then picks up the evading

6   case that's still pending.

7         His bond, and I -- and I want to point out that his

8   bond is revoked prior to August 14th.  So prior to engaging in

9   criminal history, he is already not abiding by the conditions

10   of that bond.  And that bond is revoked.  And then again,

11   obviously continuing to engage with the other individuals as

12   he's picked up last Friday.

13         So again, by his own actions, he is not going to

14   abide by the conditions that any court sets for him.

15         And last but not least is Terry Ardoin.  Again, while

16   he may not have a serious conviction history, we know that

17   starting in February 13th of 2020, he is on continual

18   supervision since that time.

19         And during that period of time, he picks up a

20   possession of marijuana, a carrying a weapon, and evading all

21   while on supervision on top of the August 14th events that he

22   participates in.  And on top of the fact that we heard that he

23   is on video surveillance I.D.'d as a shooter in a homicide case

24   all while under supervision.

25         I think each of these men by their own actions has

1  stated that there's no condition or combination of conditions

2  what will insure that they're not a danger to the community.

3         And as far as the risk of flight, I only include that

4  in the sense that I do think that it's important that each of

5  these men have made, with the exception of Jcoi Barley, bonds

6  in their cases and have the ability to make bonds and then go

7  on their merry way.

8         And so that's the only reason I would include that as

9  well.  But mainly the argument is that they are going to be a

10 danger to the community.  That's all, your Honor.

11        **THE COURT:**  Mr. Cochran, do you want to respond?

12        **MR. COCHRAN:**  Thank you, your Honor.

13        First of all, concerning risk of flight --

14        **THE COURT:**  I don't -- it's -- it's the danger to the

15 community, that's -- that's the factor --

16        **MR. COCHRAN:**  All right.

17        **THE COURT:**  -- that I'm going to rule on.

18        **MR. COCHRAN:**  Danger to the community sometimes

19 the -- the Government gets a -- a little bit ahead of itself in

20 terms of saying well the allegations should count against that.

21 Of course, an allegation's nothing but an accusation.

22        We found out today, for example, that there's no

23 evidence connecting Mr. Barley to a firearm, to a ride over

24 into a neighborhood where an alleged target is located.  It all

25 is based on --

1      **THE COURT:** Yeah. But that's not -- in a conspiracy

2    they don't have to -- that -- that's not the correct

3    interpretation of the law.  But go ahead.

4      **MR. COCHRAN:** Right.  Right.  I mean, Al Capone

5    wasn't at the Saint Valentine's Day Massacre either.

6      But so far they haven't really produced anything that

7    would indicate this man is an Al Capone of modern Houston.  And

8    the, you know, we have not been presented with -- with

9    recordings yet.

10      I grant you it's early.  And we -- we might want to

11    come back and revisit it.  But the burden is still, at least to

12    show some reason to believe, that he's dangerous to the

13    community.  His -- his offense in the T -- where he served in

14    the TDC was a narcotics offense.

15      Not every person who violates narcotics laws of the

16    state of Texas is a danger to the community.  And so I don't

17    think that deserves a lot of weight.

18      If there's any question about his -- the importance

19    to his family, I know they've tried to beat up on is mother a

20    little bit.  If the -- if the Court has any doubt as to her --

21    as to the credibility of his importance to family, we also can,

22    if the Court would like to see a photograph, camera doesn't

23    lie, of him with the children.

24      I don't think we have, you know, a photograph of his

25    grandfather.  But we gladly -- we would gladly present the

1 photographic proof as well.

2          But the -- the problem, though, the -- the problem is

3 is that there's two things that can be true.  You can love your

4 mother, and you can love your kids, and you can still be a

5 danger to the community.

6          And so that -- that's really not a factor for me to

7 consider.  The question is, is are you a danger to the

8 community, not whether you love your mother and you love your

9 children.  I mean, that -- that I think is true and it shows

10 that you may be a good person, but you could still be a danger

11 to the community.

12          **MR. COCHRAN:**  Right.

13          Well, it -- in sense of the broad community, I don't

14 think they've shown any evidence, the fact that any of these

15 people, are a -- a danger to the broad community.  It's down to

16 the question of whether or not some kind of gang war is -- is

17 going to continue.  And I don't think the Government has really

18 presented that as -- as to anybody.

19          I don't think there's been any evidence that this

20 man, you know, is likely to go to a bus stop and rob somebody

21 of their wallet.  Or, you know, go in a store and -- and even

22 shoplift, let alone rob the store.

23          And so I don't -- I don't really think the case is

24 that strong for the danger to the community, especially where

25 they can't even put him at the location of where this so-called

1 planned crime was supposed to occur.

2          And so I don't -- I don't think that's a very strong

3 factor for them either.  In -- in terms of was -- was he

4 dodging that reporting, people violate probation all the time.

5 And -- and let's not forget the role of the narcotics

6 themselves.

7          To the extent somebody is a narcotics addict,

8 sometimes the dope does some of their thinking for them.

9 And -- and there's a strong craving sometimes that you -- you

10 want the narcotics more than anything.  Your head's messed up.

11          That could have been prevented long before August of

12 this year if these officers had -- had just said well, you

13 know, we -- you need to issue a blue warrant.  We think he's

14 having a problem there.

15          And the officer tells you well, they don't, you know,

16 they don't run their warrants.  He never gave him a chance to

17 issue and run a blue warrant.  That's self-fulfilling prophesy

18 if you don't even tell the TDC that -- that he's having

19 narcotics violations.

20          So I -- I don't think the case is that strong for a

21 continuing detention.  I -- I think a suitable level of bond

22 ought to be set.

23          **THE COURT:**  Thank you.

24          Mr. McGuire?

25          **MR. MCGUIRE:**  Yes, your Honor.  On behalf of

1  Mr. McLendon.

2        I think the Court is focused on the issue of danger

3  to the community, which we understand.  What I understand

4  Mr. McLendon's involvement is with a lot of kids he grew up

5  with are now young men.

6        And his, whatever activities, and it seems like it's

7  from what I've heard, relatively minor on one occasion from

8  what I have heard today, is all in relation to this group of

9  friends.

10        So if he were GPS monitored and not allowed to have

11  any contact with any of his group of his childhood friends, I

12  think that would go a long way towards removing any kind of

13  danger to the community.

14        So I think the Court can take that into

15  consideration.

16        **THE COURT:**  But then that's something like your

17  client, he -- he was convicted of aggravated robbery, five-year

18  sentence.  The sentence expires on August 29th, 2020.  The next

19  day he's arrested for unlawful possession of a firearm.

20        **MR. MCGUIRE:**  Right.

21        **THE COURT:**  I mean, just one day off of -- one day

22  off of probation.

23        **MR. MCGUIRE:**  Well, that's true, your Honor.  That

24  was a few years ago.  But since then he has one evading arrest,

25  which is a, you know, relatively minor.

1          **THE COURT:**  But go ahead.

2          **MR. MCGUIRE:**  Understand he's made -- making some

3  mistakes, your Honor.  We just want the Court to consider the

4  possibility that with his father monitoring him and

5  disciplining him, who's indicated he's very willing and wants

6  to do that and try to get his son on the right path.  That

7  might have a strong influence.

8          And his father really has a very minor record from a

9  long time ago.  And works, or is now, I think, seeking

10  disability because of a work injury.  So there is a path here

11  to change a young man, perhaps, to a good direction and out of

12  a bad direction.

13          I just want the Court to consider that.

14          **THE COURT:**  Okay.

15          Mr. Gladden.

16          **MR. GLADDEN:**  Thank you, your Honor.

17          Just -- I would just reiterate the -- our suggestion

18  is home confinement at his parents' home.  They could monitor

19  him, GPS monitor him.  He wouldn't be leaving the house.

20          I wouldn't have to talk to my client over a

21  telephone.  Right now he's under initial curfew,  not curfew

22  but, Covid restraints.  So I can't even talk to him in person

23  at the facility on Texas Avenue so far, which makes me

24  uncomfortable.  I -- I don't like him talking over their phone

25  because they were -- seem to record everything whether they're

1  supposed to or not.

2          So I think that would -- it would be almost -- first

3  of all, he's probably going to be shipped to Harris County to

4  address those charges.  So he's not going to be out in the

5  community.

6          And if he is -- makes some sort of bond, or makes

7  some arrangements, or takes care of his business over there, he

8  would be going directly to his parents' house where he would be

9  under a GPS monitoring.  You'd know instantaneously if he was

10 violating it by leaving the house.

11         He's not going to be a danger within their house.

12 There's no evidence suggesting that.  And he's presumed

13 innocent at this point.

14         And we would ask the Court to consider that as

15 probably the most extraordinary set of conditions that you're

16 used to laying down on people in -- in these courtrooms.  And I

17 think it'd be hard to argue that that wouldn't be sufficient to

18 protect the community.

19         **THE COURT:**  Miss Raynor.

20         **MS. RAYNOR:**  Thank you, your Honor.

21         I think Miss Collins attributed one of the criminal

22 convictions to my client, when it was actually one of the co-

23 Defendants.  Say he spent five years incarcerated.  And I

24 don't -- I don't find that in the Pretrial Report and I don't

25 find it in my own recollection in -- in researching his

1  criminal history.

2        Second thing is, I've had a number of clients with

3  serious charges and offenses, and home incarceration has been

4  the result of trying to keep them from being a danger to the

5  community.  And its worked and served itself very, very well.

6        So I agree and concur with co-counsel that home

7  confinement, outside of any other conditions that Pretrial and

8  Probation would -- would order, including drug counseling.  You

9  can do that over the computer.

10        And my client works.  So he has a job.  He goes to

11  the job.  He comes home.  He does his counseling so that the

12  addiction will not override and -- and cause him to, you know,

13  to violate his conditions of a bond.

14        So I think that those conditions are sufficient to --

15  to insure that he is not a danger to -- to society or to

16  anyone, other than being a nuisance to his family at home, your

17  Honor.

18        So that's -- that's all I have to add.

19        **THE COURT:**  So let me start with the -- the probable

20  cause finding based on Detective Bock's testimony and proffer.

21        I find that there's probable cause as to all four

22  Defendants.

23        So let me start with the detention.  It's never an

24  easy decision.  And I say this, half the courtroom's probably

25  heard the speech from me, but you know, I like to think I got

1  picked to be in this position because my career was equally

2  divided between being a prosecutor and being a defense

3  attorney.

4       But on the defense side I spent more time in federal

5  prison than I know anybody in here, because I dedicated myself

6  to helping people that were serving life sentences.  And

7  I've -- the proudest moment for me is representing six

8  different people that were serving federal life sentences that

9  are now free.

10      And the decision today really to me is -- is I know

11 you're focused on the bond.  And I -- and I don't think, you

12 know, and I'm being fair, that any of you had something to do

13 with the lawyers.  But just the facts have rebutted the

14 presumption as to the danger to the community.

15      But this is really -- it's not every day I see.  And

16 in my 25 years of being a prosecutor, I mean, this is really a

17 strong case.  The Government doesn't have planes, and

18 helicopters, and intercepts and all the stuff that they had,

19 they didn't even have to call Detective Bock.

20      They -- they generally call a witness that knows the

21 least about the case, and they're all aware to appear at these.

22 But I've listened to him testify for two days now  And -- and

23 he has a really good handle on the facts.

24      And the thing that I -- I fear for all of you is

25 you're facing mandatory minimum sentences.  With your client,

1  Miss Raynor, if that machine -- and that's a 30 year mandatory

2  minimum just there.  I mean, that's -- if he's convicted of

3  that, he's going to do 85 percent of that 30 years, let alone

4  the drug stuff.

5      And so all of these gentlemen are just, you know, I people

6  are upset that I'm not giving a bond today.  But the future is

7  really what I'm concerned about.

8          Because if there all convicted at trial, and -- and

9  it's their Constitutional right to go to trial, they're just

10 facing such significant, under both the drug and the gun

11 mandatory minimums, that -- that these are the kind of folks

12 that, you know, that I represented, you know, 25, 30 years

13 later, you know.

14         And so it's really tough decisions that you all face

15 what you're going to do going forward.  And, you know, I don't

16 want to dissuade anybody from going to trial.  But it's really

17 a -- a serious case with overwhelming evidence with severe

18 mandatory minimums.

19         And it's -- you think one way today, but when I would

20 see the folks, you know, in federal prison 15, 20, 25 years

21 later, it was just a -- a different helpless feeling of what

22 they could do and decisions that they could have made

23 differently.

24         But so, I do not believe it, you know, based on the

25 law that the -- the presumption's been rebutted.  As to all

1  four.  I don't believe it's an issue of flight risk.  I know

2  they may have issues with, combined with conditions of release,

3  but I don't think any of them are going to leave the country or

4  not come to court.  It -- it's on the presumption of being a

5  danger to the community.

6        I am a Magistrate Judge as you all know.  I'm not the

7  final say because this is a -- a criminal complaint.  I'm --

8  I'm sure the case will be presented soon to a Grand Jury.  But

9  you all can appeal my decision to a District Court Judge.

10        Anything else that we need to cover.

11        **MS. COLLINS:**  No, your Honor.

12        **THE COURT:**  Okay.  Anything else from the defense?

13        **MR. MCGUIRE:**  No, your Honor.

14        **MS. RAYNOR:**  Nothing, your Honor.

15        **THE COURT:**  Okay.  Thank you all.

16     **This proceeding was adjourned at 11:04 a.m.)**

17                    CERTIFICATION

18  I certify that the foregoing is a correct transcript from the

19  electronic sound recording of the proceedings in the above-

20  entitled matter.

21   /s/ *Cheryl L. Battaglia*              March 18, 2023

22        Transcriber                        Date

23  4:22-CR-577

24  10/27/22 - 03/18/23